# UNITED STATES DISTRICT COURT
### for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. **19-M-186 (DEJ)** |
| Pedro Monarrez, Sr., DOB XX/XX/1951 | ) ) ) ) ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 2013 - December 6, 2017___ in the county of _____Milwaukee_____ in the

_____Eastern_____ District of _____Wisconsin_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), 846; and Title 18, United States Code, Section 2. | Distribution of, and Possession with Intent to Distribute, Controlled Substances and Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Luke Hepp, DEA Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __July 30, 2019__

_____
*Judge's signature*

City and state: _____Milwaukee, Wisconsin_____     David E. Jones, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

## I. INTRODUCTION

I, Luke Hepp, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI"), and have been a sworn law enforcement officer for more than 10 years. I am currently assigned to the Wisconsin High Intensity Drug Trafficking Area ("HIDTA") Heroin Initiative. HIDTA is composed of law enforcement officers from federal and state law enforcement agencies. Since, 2014 I have been deputized as a federal task force officer with the United States Department of Justice, Drug Enforcement Administration ("DEA"). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2. In connection with my official DCI and DEA duties, I investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957, Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or

assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States Currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

4.     I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

5.     Through training, experience, and discussions with other experienced agents:

a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c.     I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d.     I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e.     I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though

2

these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f.  I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g.  I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.  I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.  I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

j.  I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l.   I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

m.   I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession; and

n.   I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

6.   In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7.   This affidavit is submitted in support of an application for a criminal complaint for **PEDRO MONARREZ SR.**, DOB XX/XX/1951, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b), Distribution of, and Possession with Intent to Distribute, Controlled Substances; Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances; Use of Communications Facilities to Facilitate Controlled Substance Felonies.

8.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause.

## II.     PROBABLE CAUSE

10.     In March 2013, the Drug Enforcement Administration initiated an investigation into the drug trafficking activities of Clifton MORRISON, a.k.a "Rudy," and additional individuals. Collectively, these individuals are members of the MORRISON drug trafficking organization ("DTO"), which has distributed heroin and cocaine in and around the metropolitan area of Milwaukee, Wisconsin prior to 2013. The investigation revealed Clifton MORRISON was the leader of the MORRISON DTO. The organization acquired heroin and cocaine from multiple sources, some of whom were located in the greater Chicago, Illinois area, Las Vegas, Nevada, and El Paso, Texas.     The source(s) either delivered, or arranged to have delivered, the heroin and cocaine at locations in Chicago, Illinois and southeastern Wisconsin. The DTO then transported the narcotics to Milwaukee, Wisconsin. Once in Milwaukee, Wisconsin, the substances were prepared for distribution by DTO members under the direction of MORRISON, usually at a stash location referred to as "the office," and provided to mid-level distributors for sale.

11.     The investigation further revealed that beginning in approximately 2011, Jose RODGRIGUEZ received kilogram quantities of cocaine, and later heroin, from **Pedro MONNAREZ SR.** Jose RODGRIGUEZ then sold the cocaine and heroin to Clifton MORRISON that MORRISON distributed in the Eastern District of Wisconsin. Case agents also learned that later in the conspiracy, **Pedro MONNAREZ SR.** delegated more of the narcotics distribution work to his son, Pedro MONNAREZ, JR.

12.     During the course of the investigation, case agents utilized numerous investigative techniques including but not limited to the following: interviews with confidential sources and sources of information; information from other law enforcement officers; documentary evidence; pen register, trap and trace, and telephone toll data; controlled buys of drugs, controlled meetings with targets, recorded telephone calls with targets, and physical surveillance. Ultimately, a court authorized the monitoring of several cellular telephones used by DTO members.

13.     Also as part of the investigation, the Honorable J.P. Stadtmueller, the Honorable Pamela Pepper, and the Honorable Lynn Adelman, United States District Court Judges for the Eastern District of Wisconsin, issued Orders authorizing the interception of communications to and from cellular telephones used by David WILDER, Clifton MORRISON, Miguel RODRIGUEZ, and Jose RODRIGUEZ.

14.     On December 6, 2017, case agents executed numerous federal arrest warrants to include the arrests of MORRISON, Jose RODRIGUEZ, and Jose RODRIGUEZ's brother, Miguel RODRIGUEZ, who often picked up drug proceeds and delivered narcotics to MORRISON and other DTO members. Also on December 6, 2017, case agents executed numerous federal and state search warrants to include searches of two of MORRISON's residences, the stash location at 4245

and 4245A N. 52nd Street, Milwaukee, Wisconsin, referred to as "the office," and Jose RODRIGUEZ's residence at 4269 Ruby Street, Schiller Park, Illinois.

15.     A search of 4245 N. 52nd Street resulted in the seizure of narcotics processing equipment to include a food processor, cutting agent, digital scales, strainers, hydraulic presses, and blenders; documents; a loaded handgun with ammunition; two loaded rifles with ammunition; approximately 350 gross grams of heroin; approximately 90 gross grams of cocaine, and distribution amounts of marijuana.

16.     A search of 4269 Ruby Street, Schiller Park, Illinois, Jose RODRIGUEZ's residence, resulted in the seizure of more than 700 gross grams of cocaine, two firearms, ammunition, two cellular telephones, and other evidentiary items.

17.     On December 19, 2017, as a result of this investigation, a total of seventeen individuals were indicted by a federal grand jury in the Eastern District of Wisconsin. Clifton MORRISON, Jose RODRIGUEZ, Miguel RODRIGUEZ, and others were indicted on one count of conspiracy to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance. MORRISON, Jose RODRIGUEZ, Miguel RODRIGUEZ, and others were also indicted on substantive narcotics distribution counts.

18.     In the aftermath of the arrests and indictment of the seventeen individuals, case agents conducted proffered debriefs of several defendants in this investigation including, but not limited to, MORRISON and Miguel RODRIGUEZ. During the interviews of MORRISON, MORRISON acknowledged that Jose RODRIGUEZ had been his heroin, cocaine, and marijuana source of supply since 2010 or 2011. MORRISON estimated that initially Jose RODRIGUEZ

supplied MORRISON with approximately 150 pounds of marijuana. MORRISON then began to obtain cocaine from Jose RODRIGUEZ in 2010 or 2011, initially obtaining a half kilogram, approximately every week to 10 days for a period of about 6 months.

19. MORRISON then began to obtain multiple kilograms of cocaine at a time from Jose RODRIGUEZ. MORRISON estimated that from 2011 until the end of 2013 he obtained two to four kilograms of cocaine each month from Jose RODRIGUEZ.

20. MORRISON stated that in 2013 or 2014 Jose RODRIGUEZ advised that the cocaine was becoming more difficult to obtain because Jose RODRIGUEZ's supplier had moved away from the Chicagoland area. MORRISON continued to obtain cocaine from Jose RODRIGUEZ, but on a less-frequent basis.

21. In approximately 2013, MORRISON also began to obtain kilograms of heroin from Jose RODRIGUEZ. MORRISON said that in 2014 the heroin also became more difficult to obtain. Again, Jose RODRIGUEZ advised that his heroin source of supply had moved away from the area. MORRISON further stated that Jose RODRIGUEZ and other DTO members used the word "truck" to refer to heroin.

22. Jose RODRIGUEZ identified his source of supply to MORRISON as "Old Man." Through conversations with Jose RODRIGUEZ, MORRISON knew that "Old Man" was from Texas. MORRISON said he personally met "Old Man" a few times with Jose RODRIGUEZ at the Manheim Auto Auction in Caledonia, Wisconsin at which time Jose RODRIGUEZ identified him to MORRISON as Jose RODRIGUEZ's source of supply.

23. Case agents showed MORRISON a Texas driver's license photograph of **Pedro MONARREZ SR.** (H/M, 01/18/51). MORRISON identified **MONARREZ SR.** as "Old Man," Jose RODRIGUEZ's narcotics source of supply.

24. On March 2, 2018, and April 13, 2018, case agents conducted proffered interviews of Miguel RODRIGUEZ. Miguel RODRIGUEZ said he knew one of Jose RODRIGUEZ's narcotics sources of supply whom they called "Old Man." Case agents showed Miguel RODRIGUEZ a photograph of **Pero MONARREZ SR.** Miguel RODRIGUEZ identified **MONARREZ SR.** as the individual he knew as "Old Man."

25. At the time of the proffered statements, Miguel RODRIGUEZ said he first met **MONARREZ SR.** "a couple years ago." Miguel RODRIGUEZ related that **MONARREZ SR.** sold narcotics to Jose RODRIGUEZ; however, Miguel RODRIGUEZ did not know what specific drugs **MONARREZ SR.** sold. Miguel RODRIGUEZ also knew **MONARREZ SR.** was from Texas, previously resided in Aurora, Illinois, and would often travel to Texas.

26. On one occasion, Miguel RODRIGUEZ met **MONARREZ SR.** at an Italian Beef restaurant in the Chicago, Illinois. **MONARREZ SR.** was unable to make contact with Jose RODRIGUEZ. Consequently, **MONARREZ SR.** called Miguel RODRIGUZ to meet in order to obtain Jose RODRIGUEZ's current telephone number. **MONARREZ SR.** had Miguel RODRIGUEZ's telephone number because Miguel RODRIGUEZ had not changed it. This way, people were able to contact Miguel RODRIGUEZ if they were unable to reach Jose RODRIGUEZ. Miguel RODRIGUEZ related that he never delivered money to **MONARREZ SR.** on behalf of Jose RODRIGUEZ, and that Jose RODRIGUEZ dealt directly with **MONARREZ SR.**

27. Miguel RODRIGUEZ further stated that he was present for approximately five to six meetings between Jose RODRIGUEZ and **MONARREZ SR.**, and said these meeting occurred at Jose RODRIGUEZ's house. Miguel RODRIGUEZ recalled one occasion when **MONARREZ SR.** came to Jose RODRIGUEZ's residence in Bensenville, Illinois while Miguel RODRIGUEZ was there. Miguel RODRIGUEZ stated that the topic of the meeting between Jose RODRIGUEZ

9

and **MONARREZ SR.**, was drugs, but Miguel RODRIGUEZ did not listen in on the conversation so he could not provide specifics of the drug-related conversation. Miguel RODRIGUEZ stated that based on the parts of the conversation that Miguel RODRIGUEZ did overhear, it was Miguel RODRIGUEZ's belief that **MONARREZ SR.** was a large-scale drug trafficker. In addition, Miguel RODRIGUEZ is aware that **MONARREZ SR.** told Jose RODRIGUEZ that **MONARREZ SR.** was going to be handing off the drug sales **to MONARREZ SR.'s** son. Shortly after this meeting, Jose RODRIGUEZ began talking on the phone with **MONARREZ SR.'s** son on a more frequent basis.

28. Upon further investigation of **MONARREZ SR.**, case agents learned that investigators with the United States Immigration and Customs Enforcement's Homeland Security Investigations ("HSI") had investigated the drug trafficking activities of **MONARREZ SR.** This investigation revealed **MONARREZ SR.** was a large-scale narcotics trafficker in the greater-Chicagoland area. In 2013, this investigation also led to the initiation of a State of Illinois court-authorized wiretap of telephones used by **MONARREZ SR.'s** phone.

29. During the periods of intercepted communications, case agents intercepted numerous telephone call between **MONARREZ SR.** and Jose RODRIGUEZ. At the time, Jose was utilizing telephone number (312) 221-8589. These intercepted communications, in conjunction with surveillance, led case agents to believe Jose RODRIGUEZ was a narcotics customer of **MONARREZ SR.**

30. On approximately June 20, 2013, case agents located **MONARREZ SR.** and his vehicle in the area of 1840 Birch Lane, Aurora, Illinois, a prior residence of **MONARREZ SR.** Case agents followed **MONARREZ SR.** while he drove throughout Aurora and Montgomery,

Case 2:19-cr-00146-JPS   Filed 07/30/19   Page 11 of 15   Document 1

Illinois, but lost sight of him due to evasive counter-surveillance techniques employed by **MONARREZ SR.**

31.     On June 27, 2013, case agents conducted surveillance of **MONARREZ SR.** and followed him from 1840 Birch Lane until he eventually arrived at Jose RODRIGUEZ's residence, 158 S. Mason Street, Bensenville, Illinois. **MONARREZ SR.** walked between 158 S. Mason Street and 162 S. Mason Street carrying a large paper Macy's department store bag. Case agents observed the bag to appear heavy, and as if something square was inside the bag. As **MONARREZ SR.** left the area, he drove around the block three times. Case agents believe **MONARREZ SR.** wanted both to determine whether law enforcement was conducting surveillance of him and to evade any possible law enforcement surveillance, if it existed.

32.     On July 1, 2013, case agents followed **MONARREZ SR.** to a parking lot in Bolingbrook, Illinois where **MONARREZ SR.** met with an Hispanic male. Case agents observed **MONARREZ SR.** give this individual a shopping bag. The individual carried the shopping bag to his own vehicle and left the area. Case agents maintained observation of this individual and eventually conducted a traffic stop of him. In the shopping bag, case agents recovered $75,000 in U.S. currency. In a *Mirandized* statement, this individual advised that he knew the money was probably proceeds from **MONARREZ SR.'s** drug distribution activities.

33.     On September 26, 2013, at approximately 12:29 p.m., **MONARREZ SR.** called Jose RODRIGUEZ at (312) 221-8589. During this call Jose RODRIGUEZ asked, "Uh no, I wanted to ask, do you want to come pick up a check?" **MONARRZ SR.** replied, "Yes, uh-huh." Jose RODRIGUEZ inquired, "And, and we can talk over here in more detail, no?" **MONARREZ SR.** affirmed.     Based upon their training and experience, case agents believed that Jose

Case 2:19-cr-00146-JPS   Filed 07/30/19   Page 12 of 15   Document 1

RODRIGUEZ wanted to meet so he could turn over drug-related proceeds ("a check") to **MONARREZ SR.**

34. At approximately 1:00 p.m., case agents established surveillance at Jose RODRIGUEZ's residence, 158 S. Mason Street, Bensenville, Illinois. At approximately 1:33 p.m., case agents observed **MONARREZ SR.** park in Jose RODRIGUEZ's driveway, out of the view of case agents. At approximately 2:10 p.m., case agents observed **MONNAREZ SR.** depart the residence. Based upon their training, experience, and familiarity with the investigation, case agents believe **MONARREZ SR.** traveled to Jose RODRIGUEZ's residence to obtain drug-related proceeds owed to him by Jose RODRIGUEZ.

35. On October 3, 2013, at approximately 5:06 p.m., Jose RODRIGUEZ, using (312) 221-8589, called **MONARREZ SR.** Jose RODRIGUEZ stated, "I was only calling you to let you now that, you know, that the black truck is not the one they are looking for. You know that it's not, it's not. That's like from way back. You understand more or less?" **MONARREZ SR.** replied, "Oh?" Jose RODRIGUEZ continued, "So then, the only thing with that, is that… Look, it is not the same thing. So then, you know that they're saying that it is, that it is at, close to half the price than what you are saying. Understand? That is more or less what they do when, when they work with that." **MONARREZ SR.** responded, "Yes." Jose RODRIGUEZ said, "There's only one person who, who is interested in that but not at, uh, not at that number. Do you understand?" **MONARREZ SR.** asked, "At what amount, man?" Jose RODRIGUEZ replied, "Uh, well, he's telling me, uh, that I have to, at four-zero." **MONARREZ SR.** replied, "That's fine."

36. As indicated above, case agents familiar with Jose RODRIGUEZ know he often used the term "truck" to refer to heroin. Therefore, case agents believe Jose RODRIGUEZ told

**MONARREZ SR.** that Jose RODRIGUEZ's narcotics customer did not like the black heroin ("black truck") **MONARREZ SR.** supplied. Jose RODRIGUEZ related that his customer did not want this type of heroin and described it as the type of heroin **MONARREZ SR.** provided on a past occasion ("That's like from way back."). In addition, Jose RODRIGUEZ said his customers wanted to only pay half of what **MONARREZ SR.** wanted to charge for this black heroin ("So then, you know that they're saying that it is, that it is at, close to half the price than what you are saying."). **MONARREZ SR.** asked how much Jose RODRIGUEZ's customer was willing to pay ("At what amount, man?"), and Jose RODRIGUEZ advised they were willing to pay $40,000 per kilogram for that type of heroin ("...he's telling me, uh, that I have to, at four-zero.").

37. At some point in time during 2013, **MONARREZ SR.** believed that he may have been under investigation by law enforcement. Case agents learned that **MONARREZ SR.** packed his belongings into his vehicle and told a family member that he was moving to Texas, and turning his narcotics trafficking activities over to his son. Case agents discovered that **MONARREZ SR.** stopped using his known telephones and left the Chicagoland area. HSI agents in Illinois were unable to arrest **MONARREZ SR.**

38. Case agents know that **MONARREZ SR.'s** departure from the Chicagoland area correlated with Miguel RODRIGUEZ's statement that later on **MONARREZ SR.** turned over the drug business over to his son. **MONARREZ SR.'S** departure also coincided with MORRISON's statement that in 2013 or 2014 it began to take longer for Jose RODRIGUEZ to obtain narcotics from his supplier.

39. Case agents conducted a forensic download of the (414) 739-9029 cellular telephone recovered from MORRISON's residence on December 6, 2017, during the execution of a federal search warrant at this location. A review of this downloaded material revealed

13

MORRISON was in contact with Jose RODRIGUEZ's (312) 221-8589 telephone. In MORRISON's telephone, (312) 221-8589 was saved in the contacts as "Jr." which case agents believe is short for Jose RODRIGUEZ. Between July 13, 2013 and August 6, 2013, case agents located at least 18 calls and/or texts between MORRISON's (414) 739-9029 telephone and Jose RODRIGUEZ's (312) 221-8589 telephone.

## III.  CONCLUSION

40.  Based on the forgoing, I believe there is probable cause to believe that **Pedro MONARREZ SR.** has committed violations of federal law, including Title 21, United States Code, Sections 841, 846, and 843.